UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BIRT FORD,                              )
                                        )
                    Petitioner,         )
                                        )
          v.                            )          No. 1:20-cv-01639-RLY-TAB
                                        )
DUSHAN ZATECKY,                         )
                                        )
                    Respondent.         )

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Birt Ford was convicted of criminal deviate conduct, rape, burglary, criminal confinement, and invasion of privacy in an Indiana state court. Ford now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Ford alleges that the trial court erred in admitting certain evidence and that his trial and appellate counsel rendered ineffective assistance of counsel in several respects. The first issue is not cognizable, and the Indiana Court of Appeals reasonably applied federal law in Ford's post-conviction appeal with respect to his ineffective assistance of counsel claims. Therefore, Ford's petition for a writ of habeas corpus is **denied**, but a certificate of appealability will issue with respect to one of Ford's ineffective assistance of trial counsel claims.

## I. BACKGROUND

### A. The Crime and Trial

Federal habeas review requires the Court to "presume that the state court's factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence." *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018); *see* 28 U.S.C. § 2254(e)(1). The following summary is adapted from the Indiana Court of Appeals' recitation of facts on postconviction, *Ford v. State*, 145 N.E.3d 140, 2020 WL 1316389, *2 (Mar. 20, 2020)

1

(*Ford II*), *trans. denied* (citing *Ford v. State*, 856 N.E.2d 795, 2006 WL 319722, *1 (Ind. Ct. App. Nov. 6, 2006) (*Ford I*), *trans. denied*).

Ford's victim was his wife, Yolanda. Their teenage daughter Laressa witnessed some of the events and testified at trial.

In January 2005, police went to the couple's residence to help Yolanda remove some personal items. During the encounter, Ford told a police officer, "I could do something to my wife while you are here in a nanosecond and there isn't anything you could do." Tr. 238 (hereinafter "the January incident").

Yolanda obtained a protective order against Ford on May 27, 2005. On May 30, Ford called Yolanda several times and, upon hearing she was at a cousin's house, went to the house and used force to try to get Yolanda to leave with him, resulting in visible injuries to Yolanda's arms and stomach. After that incident, Yolanda and the children went to a women's shelter (hereinafter "the May incident").

On June 11, 2005, Yolanda and the children returned to the residence she rented from the housing authority which had in place a no-trespassing order against Ford. That night, Yolanda fell asleep on the couch while watching television with Laressa. She awoke to Ford kicking in the back door. Yolanda tried calling 911, but Ford grabbed her phone, removed the battery, and threw it to the floor. He then blocked the back door with a table and retrieved a butcher's knife from the kitchen.

Ford, armed with the knife, forced Yolanda to go into a bedroom. Once in the room, he locked the door and told her that if police arrived, he would kill her and force the police to kill him. Still holding the knife, Ford then compelled Yolanda to perform oral sex.

They then heard sirens, and Ford repeated his threat to kill Yolanda if police entered the

apartment. Ford called out to Laressa, who said there was a fire across the street. Ford left the bedroom, confirmed there was a fire, and then warned Laressa that if the police came to the house, "both her parents [would] be dead." Tr. 168.

Ford and Yolanda went back into the bedroom, and Ford put the knife on a nightstand. Ford then had sex with Yolanda, during which he asked her whether she felt violated and she said yes. Tr. 172. They went to bed. Yolanda never tried to leave the bedroom because she was afraid of waking Ford.

The next morning, Ford again had sex with Yolanda. While he was in the shower, Yolanda's mother came to the apartment, and Yolanda and the children left. Yolanda called the police and was taken to a sexual assault treatment center where the examining nurse found injuries consistent with forced penetration.

Later that day, Ford was interviewed by police while shackled. During the videotaped interview, he admitted to violating the protective order and entering the apartment without permission but denied kicking the door in. He admitted he stepped on Yolanda's phone but said she threw it at him first. He also admitted to having a knife but said he had brought it for Yolanda and told her to stab him with it if she felt threatened by him. He acknowledged having sex twice with Yolanda but said it was consensual.

At trial, evidence about the January and May incidents were admitted over his objection, and, after an unsuccessful motion to suppress, the videotaped interview was played for the jury. The jury found Ford guilty on all charges except one count of rape and interference with the reporting of a crime, and the trial court subsequently imposed a 70-year aggregate sentence.

### B. Direct Appeal and Post-Conviction Proceedings

On direct appeal, Ford challenged the admission of evidence concerning the January and

May incidents and argued his sentence was inappropriate. The Indiana Court of Appeals affirmed his convictions, finding that any evidence about those incidents was harmless in light of the substantial evidence against him, and determined his sentence was appropriate. *Ford I*, 2006 WL 319722, at *4–5.

Ford filed a petition for post-conviction relief on August 28, 2007. Dkt. 8-3. After the State Public Defender and private counsel entered and withdrew appearances, the State moved to require Ford to submit the case by affidavit.[1] *Id.* at 2–3. Ford objected to proceeding by affidavit, but the post-conviction court overruled his objection. *Id.* at 5. Ford filed a motion to compel, seeking the court's assistance in acquiring affidavits from trial and appellate counsel after they twice failed to respond to his letters. *Id.* at 5; PCR App'x Vol. II at 126−28. He included receipts showing the second round of letters was sent via certified mail. PCR App'x Vol. II at 128. The post-conviction court denied the request, finding—without acknowledging the certified mail receipts—that there was "nothing in the record of this cause indicating defendant [had] actually requested any such affidavits from counsel." *Id.* at 129.

Ford then moved for leave to depose counsel. Dkt. 8-3 at 6. The post-conviction court took the motion under advisement pending submission of the case by affidavit, stating that once the affidavit was reviewed the court would "make a determination if the case requires an evidentiary hearing." *Id.*

Ford submitted an affidavit stating the various ways he believed trial and appellate counsel were ineffective. PCR App'x Vol. II at 142−45. The post-conviction court denied his petition, and he appealed. *Ford II*, 2020 WL 1316389. On appeal, Ford alleged trial counsel was ineffective for:

---

[1] Indiana Post-Conviction Rule 1(9)(b) provides that when a petitioner proceeds pro se, the post-conviction court may order the cause submitted upon affidavit rather than hold an evidentiary hearing.

(1) failing to investigate;

(2) failing to call impeachment witnesses;

(3) failing to consult experts;

(4) failing to object to biased jurors;

(5) failing to object to statements the prosecutor made during voir dire and closing argument;

(6) failing to pursue plea negotiations;

(7) failing to call Ford to testify after promising during opening that he would; and

(8) failing to raise a *Batson* challenge after the dismissal of the only African American juror.

Dkt. 8-11 at 9. He also alleged that appellate counsel was ineffective for failing to challenge evidence of the January and May incidents under Indiana Evidence Rule 403 and failing to challenge the imposition of consecutive sentences. The Indiana Court of Appeals denied relief on all claims, and the Indiana Supreme Court denied his petition to transfer. *Ford II*, 2020 WL 1316389; dkts. 8-14, 8-16.

### C. Petition for a Writ of Habeas Corpus

Ford filed the instant petition for a writ of habeas corpus on June 16, 2020. Dkt. 1. Ford alleges that the trial court erred under Indiana Evidence Rule 404(b) by admitting evidence of the January and May incidents. He also alleges that his trial and appellate counsel were ineffective on the same grounds that he raised in the state courts.

On August 31, 2020, Ford filed a motion for evidentiary hearing, arguing that the state post-conviction court denied him a full and fair fact hearing. The Court denied the motion but noted it would determine whether a hearing is warranted once the materials were reviewed. On July 27, 2021, the Court ordered supplemental briefing on whether an evidentiary hearing could be heard on one of the claims of ineffective assistance of counsel. Both parties have

responded, and Mr. Ford's petition is now ripe.

## II. LEGAL STANDARD

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state court's adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302. "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]"

6

*Wilson v. Sellers*, 138 S. Ct. 1188, 1191−92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

### III. DISCUSSION

Ford's petition raises three issues: (1) whether the trial court erred by permitting evidence of bad prior conduct; (2) whether trial counsel was ineffective; and (3) whether appellate counsel was ineffective.

## A. Evidentiary Claim

"Errors in state law in and of themselves are not cognizable on habeas review. The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). "Because a state trial court's evidentiary rulings and jury instructions turn on state law, these are matters that are usually beyond the scope of federal habeas review." *Id.*

Ford argues that the trial court committed reversible error when it allowed the admission of evidence about the January 2005 incident, where Ford told a police officer he could harm his wife in a "nanosecond" if he wanted to, and the May 2005 incident, where Ford tried to forcibly remove Yolanda from her cousin's house, inflicting bruises on her arms and stomach in the process. But this claim arises under Indiana Evidence Rule 404(b) and as such is a non-cognizable state law claim that provides no basis for relief on habeas review.

## B. Ineffective Assistance of Trial Counsel

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on a claim that counsel was ineffective, a petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness" and (2) "that the deficient performance prejudiced the defense." *Id.* at 687−88. Where the provisions of § 2254(d) apply, courts apply two layers of deference in assessing counsel's performance: "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Further, counsel's strategic decisions "are entitled to a strong presumption of reasonableness," and "[t]he burden of rebutting this presumption rests squarely on the defendant." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (internal quotation marks and citations omitted).

The Indiana Court of Appeals was the last reasoned decision to discuss Ford's claims. The court correctly cited the *Strickland* standard. *Ford II*, 2020 WL 1316389 at *3. Additionally, the court stated, "It is worth noting that neither Ford's trial nor appellate counsel testified, submitted affidavits, or were deposed in this proceeding. 'When counsel is not called as a witness to testify in support of a petitioner's arguments, the post-conviction court may infer that counsel would not have corroborated the petitioner's allegations.'" *Id.* (quoting *Oberst v. State*, 935 N.E.2d 1250, 1254 (Ind. Ct. App. 2010)).

Ford alleges that trial counsel was ineffective in many respects. First, he alleges that his trial counsel failed to prepare or conduct reasonable investigation. This was a speedy trial that began on August 9, 2005, yet counsel was not appointed until July 1, 2005, and admitted on the record that he had spent July focusing on a double homicide trial and did not obtain a copy of the interrogation tape until the day before Ford's trial. Tr. 4–5. Ford argues that the late appointment and attention to another case caused trial counsel to make a variety of missteps.

The Indiana Court of Appeals declined to assess counsel's alleged unpreparedness as a separate claim: "rather than make a distinct claim of unpreparedness, Ford cites it as a contributing factor to the alleged ineffective assistance in several more of his specific claims." *Ford II*, 2020 WL 1316389 at *3. The court then analyzed each of Ford's specific allegations. This was a reasonable way to organize its opinion, and this Court does the same.

### i.       Ineffective Assistance During Plea Negotiations

Though this is the third claim discussed by the Indiana Court of Appeals, the Court addresses it first because it is different in nature than the claims about counsel's performance during trial, and it presents concerns about whether an evidentiary hearing is needed.

### 1.   Failure to Pursue a Plea

Ford alleges that trial counsel was ineffective for failing to explore a plea deal with the state. The right to effective assistance of counsel extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). If a formal offer is made by the prosecution, defense counsel has a duty to communicate the terms of the plea offer to the defendant. *Missouri v. Frye*, 566 U.S. 134, 145 (2012). To establish prejudice where a plea offer has lapsed due to counsel's deficient performance, the defendant must demonstrate a reasonable probability that he would have accepted the plea and that that the plea would have been entered without the prosecution canceling it or the trial court rejecting it. *Id.* at 147. Further, "it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.*

According to Ford, the prosecutor sent Ford's attorney a letter on July 13, 2005, a few weeks before trial, offering to discuss a plea offer. Dkt. 1 at 13. Ford alleges that he told trial counsel to discuss a plea with the prosecutor, but counsel failed to follow up.

The Indiana Court of Appeals held that Ford failed to meet his burden of proof on this claim, stating:

> Ford contends that his trial counsel was ineffective for failing to explore a plea deal with the State. Ford concedes that his trial counsel did inform him of a letter from the State regarding a potential guilty plea. Ford contends, however, that he instructed his trial counsel to pursue the matter but that he did not. The only support for Ford's claim that "defense counsel did nothing concerning [Ford's] request" to discuss a plea agreement with the State, Appellant's Br. p. 15, is provided by his

> own self-serving affidavit, which the post-conviction court was under no obligation
> to credit. Moreover, because Ford's trial counsel did not provide any evidence in
> this proceeding, we may presume that he would not have corroborated Ford's
> account.

*Ford II*, 2020 WL 1316389 at *5. At first blush, there is nothing wrong with the court's analysis.

As discussed, it was Ford's burden to prove his trial counsel was ineffective. *Dunn*, 141 S. Ct. at

2411 (finding absence of testimony or other evidence from trial counsel was "particularly

significant given the range of possible reasons … counsel may have had for proceeding as they

did." (internal quotation marks and citation omitted)); *see also Toro v. Fairman*, 940 F.2d 1065,

1068 (7th Cir. 1991) ("[Petitioner's] statement is self-serving and alone, insufficient to establish

that, but for counsel's advice, there is a reasonable probability that he would have accepted the

plea."). But the court's analysis ignores the fact that Ford *tried* to obtain trial counsel's testimony,

both by writing him letters and by asking the trial court to compel him to provide an affidavit,

participate in a deposition, or hold an evidentiary hearing.

Putting aside this misstep, the Indiana Court of Appeals essentially accepted the post-

conviction court's rejection of Ford's plea bargain claim. Thus, it is helpful to examine the post-

conviction court's more thorough rationale for finding Ford failed to meet his burden. *See Jordan*

*v. Hepp*, 831 F.3d 837, 843 (7th Cir. 2016) (noting where court of appeals adopted trial court's

order, the trial court's order can be considered as part of the "last reasoned opinion" of the state

court). The post-conviction court stated,

> Petitioner complains that Attorney Hicks failed to pursue plea negotiations
> [Amended Petition, at 8−9; Petitioner's Affidavit, at 2]. He does not assert that he
> would have admitted his guilt at any time. Indiana does not allow so-called "best
> interest" or "*Alford*" guilty pleas in which a defendant pleads guilty while still
> claiming to be innocent. *Ross v. State*, 456 N.E.2d 420, 423 (Ind. 1983). Petitioner
> does not identify any circumstances under which he would have tried to enter a plea
> of guilty while maintaining a discreet silence about his belief that he was not
> guilty—nor has he shown that this Court would have accepted a guilty plea from
> him without hearing his own account of facts that made him guilty. As he has not

shown that plea negotiations would have affected the outcome of the proceeding, he has not shown that Attorney Hicks was ineffective in failing to pursue plea negotiations.

Dkt. 8-10 at 18−19, ¶ 13.

This was not an unreasonable application of Supreme Court jurisprudence. Ford had to show that but for counsel's deficient performance, there would have been a beneficial plea offer that would have been accepted by Ford, the state, and the trial court. *Lafler*, 566 U.S. at 171; *Frye*, 566 U.S. at 147. First, there is no evidence of an uncommunicated formal plea. *Frye*, 566 U.S. at 145. But even assuming that the prosecutor had a plea offer in mind—given her prior communications with counsel—there is evidence that Ford maintained his innocence. *See, e.g.* PCR App'x Vol. II at 144 (Ford's affidavit stating, "Mr. Hicks further failed to object when the State during voir dire shifted the burden to me making it vital I testify to prove my innocence (which Mr. Hicks did not allow to happen.)"). Because Indiana does not permit pleas if a defendant refuses to admit his guilt, the post-conviction court reasonably concluded that Ford failed to meet his burden on this claim. *See Alkhalidi v. Neal*, 963 F.3d 684, 687 (7th Cir. 2020) (holding where defendant was committed to maintaining his innocence, he failed to show a reasonable probability that the trial court would have accepted his plea since "Indiana requires the defendant to admit the factual basis of the plea.").

### 2.  Necessity of an Evidentiary Hearing

Although the state court's resolution was reasonable, the Court harbors concerns about Ford's ability to fairly litigate this claim given the post-conviction court's refusal to hold an evidentiary hearing or otherwise assist Ford in procuring testimony from his attorneys. This refusal did not affect the Court's review of the ineffective assistance claims for alleged errors that occurred during trial; the Court reviewed the record and could assess trial counsel's performance as a whole

when assessing the reasonableness of the Indiana Court of Appeals' decision. But there is an evidentiary lacuna when it comes to Ford's claim about trial counsel's performance during the plea-bargaining process. Without trial counsel's testimony, we don't know what counsel did or did not do. For example, it is possible that counsel did communicate with the prosecutor, who may have had a plea agreement drafted, and then he forgot to communicate the plea to Ford. And the Indiana Court of Appeals faulted the lack of testimony when it determined that Ford failed to meet his burden on this claim. *See Ford II*, 2020 WL 1316389 at *5. Thus, the Court requested additional briefing on whether an evidentiary hearing could be held to develop the factual basis of the claim. Dkt. 16.

Generally, a federal court's "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). However, if the federal court finds factual aspects of a state court's decision unreasonable under §2254(d)(2), *Pinholster* does not prohibit the court from holding a hearing. *Lee v. Kink*, 922 F.3d 772, 775 (7th Cir. 2019) ("Illinois wants us to treat [*Pinholster*] as equivalent to a rule that state courts may insulate their decisions from federal review by refusing to entertain vital evidence. Yet a state court's refusal to consider evidence can render its decision unreasonable under §2254(d)(2) even when its legal analysis satisfies §2254(d)(1)".)

Further, to qualify for an evidentiary hearing, a petitioner must show that, through no fault of his own, the state-court record lacks essential facts. *Id.* at 773. "Section 2254(e)(2)(A)(ii) permits the district court to conduct an evidentiary hearing in limited circumstances: namely, when the state court record does not contain sufficient factual information to adjudicate a claim, and 'the factual predicate could not have been previously discovered through the exercise of due diligence.'" *Jordan*, 831 F.3d at 849.

As discussed, the state court's resolution of this claim did not rest on trial counsel's acts or omissions but rather on its factual finding that no plea would have been accepted because Ford maintained his innocence. *See Lafler*, 566 U.S. at 171; *Frye*, 566 U.S. at 147. And there was evidentiary support for this factual finding. Thus, because the state court did not make an unreasonable factual determination under §2254(d)(2), Ford does not qualify for an evidentiary hearing.[2]

However, because jurists of reason could disagree with the Court's resolution of this claim, a certificate of appealability is **granted** as to this claim.

### ii.   Ineffective Assistance During Trial

The Court now addresses Ford's claims about alleged errors that occurred during trial.

### 1.   Failure to Adequately Challenge Statement to Police

Ford argues that trial counsel failed to adequately challenge the admission of his videotaped statement on Fourth and Fifth Amendment grounds. The Indiana Court of Appeals rejected this claim because Ford failed to show that "trial counsel could have altered his approach in any way that would have resulted in suppression of the statement." *Id.*

As to the Fourth Amendment, there was no dispute that Ford was seized at the time of his interview because he was shackled. Absent an arrest warrant, "Ford's seizure was constitutional only if authorities suspected him of wrongdoing." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 551–52 (1980)). Ford does not argue that law enforcement lacked reasonable suspicion. The state court found that Ford's Fourth Amendment claim was rooted in concern about the shackling

---

[2] The Court need not decide whether Ford was diligent in his pursuit of testimony from his trial counsel, though Seventh Circuit precedent would suggest he was. *See Lee*, 922 F.3d at 774 ("[B]y asking for a hearing to explore an ineffective-assistance theory, …Lee strongly implied what topics would be covered at a hearing. … He did what he could, and the absence of evidence … must be attributed to the state judiciary's failure to afford him a hearing.").

itself. The court rejected the argument because Ford provided no legal authority that shackling a suspect during an interview is *per se* illegal or unreasonable in these circumstances. This conclusion was reasonable. While being handcuffed or shackled is probative evidence that a person has been seized, *see, e.g. United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014), there is no Supreme Court precedent stating that handcuffing or shackling a suspect during an interview runs afoul of the Fourth Amendment.

The court then proceeded to evaluate whether Ford's statement was voluntary. To determine whether a confession is voluntary, the court must assess the totality of surrounding circumstances, "including: (1) the defendant's age, intelligence, experience, education, mental capacity, and physical condition at the time of questioning; (2) the legality and duration of the detention; (3) whether the suspect was given *Miranda* warnings; (4) the duration of the questioning; and (5) the existence of any physical or mental abuse." *Lentz v. Kennedy*, 967 F.3d 675, 685 (7th Cir. 2020) (internal quotation marks and citation omitted).

The Indiana Court of Appeals examined the totality of the circumstances and found that the confession was voluntary. In doing so, the court adopted the prosecutor's summary of the events made during the suppression hearing (which was consistent with the court's own review of the video). *Ford II*, 2020 WL 1316389 at *4–5. As the prosecutor explained, Ford had a high school diploma and two years of college. Ford initially expressed interest in pleading the Fifth Amendment but then proceeded to question the detective and repeatedly told him that he wanted to talk to him. The detective tried to leave the room four times, but Ford continued to speak to the detective. The detective left the room for about fifteen minutes, and when he returned Ford confirmed that he wanted to speak with him and signed the advisement of rights. The court concluded, "Far from being coerced, the totality of the circumstances indicates that Ford practically

15

insisted on telling the detectives his side of the story." *Id.* at *5. Having reviewed the videotape, the Court agrees that, based on the totality of the circumstances, Ford's inculpatory statements were voluntarily provided to law enforcement.

Based on its conclusion that the statement was properly admitted, the court concluded that "trial counsel was not ineffective for failing to more vigorously challenge the admission of his statement to police." *Id.* This was a reasonable application of *Strickland*. Counsel cannot be ineffective for failing to win a losing argument.

### 2. Failure to Call Impeachment Witnesses

Ford alleges that trial counsel was ineffective for not calling Barbara and Jimmy Ford as witnesses. Ford says the witnesses would have testified that Yolanda had a propensity to lie. Barbara would have testified about two specific lies that Yolanda told, and Jimmy would have testified about Yolanda's propensity to lie. Under Indiana Evidence Rules 608 and 609, "a witness's credibility can be impeached by opinion or reputation evidence as to the witness's character for truthfulness but *not* by specific instances of untruthfulness unless they have resulted in convictions for dishonesty-related offenses." *Id.*

Ford did not offer an affidavit from either witness during post-conviction proceedings. Ford did not argue that the specific lies Barbara would have testified about resulted in convictions for dishonesty-related offenses. The Indiana Court of Appeals held that because Ford failed to establish that either Jimmy or Barbara's testimony would have been admissible, he could not establish that trial counsel was ineffective. This is a reasonable application of *Strickland*. Attorneys' strategic decisions, including which witnesses to call, "are entitled to a 'strong presumption' of reasonableness." *Reeves*, 141 S. Ct. at 2410 (quoting *Richter*, 562 U.S. 104). Counsel could not be ineffective for failing to call two witnesses whose purported testimony would

have been inadmissible. *See Kavanaugh v.* Berge, 73 F.3d 733, 736 (7th Cir. 1996) ("[F]ailure to offer inadmissible evidence is not ineffective assistance.").

### 3.  Failure to Present Expert Testimony

Ford alleges that trial counsel was ineffective for failing to hire or call experts in sexual assault and mental health. With respect to a sexual assault expert, he believes the expert could have rebutted a nurse's testimony that Yolanda sustained "shearing" injuries on her cervix consistent with blunt force trauma. Tr. 260−65. He also alleges that if trial counsel had consulted with an expert, he would not have asked the nurse whether vaginal dryness could also have caused the shearing. Tr. 265−66. The nurse answered that only blunt force trauma or impact caused shearing, *id.* at 266, bolstering the State's evidence that Ford raped Yolanda.

The Indiana Court of Appeals concluded that because Ford failed to "explain what such an expert would have said or how the testimony could have helped him at trial," or how an expert would have assisted his trial counsel in addressing the nurse's testimony, his claim was too vague to establish ineffective assistance of counsel. *Ford II*, 2020 WL 1316389 at *5. This was a reasonable application of *Strickland*. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" (quoting *Strickland*, 466 U.S. at 689)). Further, although not explicitly addressed by the Indiana Court of Appeals, Ford cannot show he was prejudiced by trial counsel's question about alternative causes of shearing. After receiving an undesirable answer, counsel asked the nurse whether shearing was necessarily the result of rape, and she testified, "I cannot say that." Tr. 266.

With respect to a mental health expert, Ford alleges that trial counsel should have called an expert who could "testify about being bi-polar and the cause and effect of …not taking the

medication to treat this disorder." Dkt. 1 at 16. He elaborated that "an expert would have at least

explained this bi-polar disorder to the jury so they understood how the victim (Petitioner's wife)

would have been acting before and during this alleged crime while being bi-polar and not taking

medication to treat it." *Id*. Ford presented this argument verbatim to the Indiana Court of Appeals.

*Compare* dkt. 1 at 16 *with* dkt. 8-11 at 18−19.

Also embedded in this argument is Ford's claim that trial counsel should have objected to

Yolanda's testimony that her mental health counselor was aware that Yolanda was not taking

medication. He alleges this testimony prejudiced him because (1) there was no way to confirm that

the mental health counselor knew Yolanda was not taking medication, and (2) the prosecutor

referred to this testimony in closing argument to discredit his argument that Yolanda acted

irrationally when not on medication. Dkt. 1 at 16−18; *see also* dkt. 8-11 at 19−21.

The Indiana Court of Appeals stated:

> Ford contends that his trial counsel was ineffective for failing to call a witness who
> would testify that *Yolanda was taking medication to treat bi-polar disorder around
> the time of Ford's crimes*, which would have contradicted Yolanda's testimony that
> she was not taking her medication. Even if such a witness had so testified, we fail
> to see how such an impeachment would have helped Ford. We think it is a stretch,
> to say the least, to maintain that a jury would be likely to conclude that Yolanda
> was lying about Ford's crimes against her based on the fact she lied about not taking
> her medication, even if true. Corroborating evidence of Ford's crimes makes this
> even less likely. The jury saw and heard ample evidence beyond Yolanda's
> testimony that Ford committed the crimes for which he was convicted, including
> Nurse Richards's testimony, photographic evidence of the crime scene, Laressa's
> testimony, and—last but not least—Ford's own incriminating statements. Ford has
> failed to establish how he was prejudiced in this regard.
>
> Ford also contends that an expert should have been found who could have testified
> regarding the effect on a person's behavior when they do not take medication for
> bi-polar disorder. For one thing, this claim is inconsistent with Ford's apparent
> claim that he had evidence that Yolanda was, in fact, taking her medications. In any
> event, Ford does not explain what such an expert would have said that would have
> had any bearing on his trial whatsoever, only that he wanted such an expert to
> "testify about being bi-polar and the cause and effect of and not taking the

medication to treat this disorder[.]" Appellant's Br. p. 21. Ford has failed to establish ineffective assistance of trial counsel in this regard.

*Ford II*, 2020 WL 1316389 at *6 (emphasis added).

The first part of the court's analysis reflects a misunderstanding of Ford's argument. Ford's position was consistent in that he believed Yolanda was not taking medication to treat her bipolar disorder, which he alleged caused her to act irrationally or erratically.

But the court did address Ford's position in the next paragraph, concluding that Ford failed to explain how an expert on bipolar disorder would have changed the outcome of his trial. In doing so, the Indiana Court of Appeals reasonably concluded that Ford failed to prove he was prejudiced by the absence of a mental health expert in light of the "ample evidence" of Ford's guilt. *Id.* The Court agrees. In addition to Yolanda's testimony, Laressa saw Ford with a knife and was on the receiving end of his threat to kill Yolanda if Laressa tried to call the police. Tr. 197, 202. Ford's interview with police corroborated much of Yolanda's version of events, insofar as he admitted that he entered the house without her permission, they engaged in sexual acts, he advised her that if the police came she would have to kill him, and there was a knife in the bedroom. Dkt. 8-10 at 6−7. Pictures of the broken door and knife on the nightstand were admitted into evidence. Exs. 7, 14. Yolanda immediately reported the assault and underwent a sexual assault exam which revealed physical trauma. Thus, in light of the corroborating evidence, Ford has not shown a reasonable likelihood that a mental health expert's testimony would have changed the outcome of the trial. And for the same reason, he has failed to demonstrate prejudice resulting from Yolanda testifying that her counselor was aware that she was not on medication.

### 4. Failure to Object to Biased Jurors

Ford next argues that trial counsel was ineffective for failing to challenge several jurors who had been victims or knew victims of sexual or violent crime: Juror 14 had been robbed at

knifepoint; Juror 12 was a robbery victim; Juror 53 knew a sexual assault victim; and Juror 62 had been in a violent domestic relationship for five years.

The Indiana Court of Appeals rejected this claim because all four jurors affirmed that their personal experiences would not affect their abilities to serve as jurors, and Ford produced no evidence that would have provoked counsel to challenge the veracity of their testimony. *Ford II*, 2020 WL 1316389 at *6. Merely being a victim of a crime is not a basis for a strike for cause. *See* Indiana Jury Rule 17. And jurors are not required to forget past experiences but rather must "'set aside any opinion [they] might hold, relinquish [their] prior beliefs, or put aside [their] biases or [their] prejudicial personal experiences." *Wesley v. Pfister*, 659 F. App'x 360, 363 (7th Cir. 2016) (quoting *United States v. Allen*, 605 F.3d 461, 465−66 (7th Cir. 2010)).

Ford's claim of implied bias is without merit. A claim of implied bias "requires 'exceptional' or 'extreme circumstances' giving rise to an implication of bias." *United States v. Kuljko*, 1 F.4th 87, 93 (1st Cir. 2021) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)). Examples include the juror being an employee of the prosecutor's office, a juror who is closely related to one of the participants in the trial, or a juror who was a witness or otherwise involved in the crime. *Smith*, 455 U.S. at 222; *see also United States v. Brazelton*, 557 F.3d 750, 754 (7th Cir. 2009) (noting that "the question comes down to whether the relationship is close enough to assume bias"). None of the jurors had such a relationship that would trigger a finding of implied bias.

Because Ford produced no proof of bias, the Indiana Court of Appeals reasonably applied *Strickland* when rejecting this claim.

### 5.  Failure to Object to Prosecutor's Statements

Ford alleges that trial counsel should have objected when, during voir dire, the prosecutor asked the venire, "When something happens, you like to hear both sides of the story. Who likes to hear both sides of the story?" Tr. 60. Ford alleges this was an impermissible comment on his right not to testify. The Indiana Court of Appeals rightfully rejected this argument because Ford took the comment out of context. *Ford II*, 2020 WL 1316389 at *7. Immediately after posing the question, the prosecutor said,

> Do you understand in a criminal case sometimes you don't hear both sides? . . . And even though you might want to hear from him, he has the right not to, for whatever reason. Do you understand that? …Can you not hold that against him? . . . 'Cause the law is going to say you can't hold that against him. So do you think you can base the decision on the evidence and not hold anything against Mr. Ford if he chooses not to talk. Is that okay?

Tr. 61−62. The court concluded, "Far from committing misconduct, the prosecutor was *clarifying* that a defendant's refusal to testify could not be held against him." *Ford II*, 2020 WL 1316389 at *7 (emphasis original). This was a reasonable application of *Strickland*. Because the prosecutor did not improperly comment on Ford's right to not testify, counsel was not ineffective for failing to object to the statement.

### 6.  Failure to Call Ford to Testify

Ford alleges that trial counsel was ineffective for failing to call Ford to testify after promising several times in opening statement that he would. And promise he did. During opening, counsel made the following statements:

- "And Birt's going to testify too. [Regarding the criminal deviate conduct charge] Birt will tell you that is—that is not true." Tr. 133.

- Birt's going to tell you that during the course—he went over there. He was trying to save his marriage." Tr. 134.

- "Matter of fact, Birt will tell you that while he and Yolanda were in the bedroom, they called the daughter back into the bedroom and said everything was okay." Tr. 135.

- "They lived in a tough part of town and they always—Birt will tell you, he'll testify to this. They always either had a knife or some kind of crowbar is what Birt will tell you. Some sort of weapon in that house in case of a break in." Tr. 135.

- "Birt's going to tell you that when they were having this conversation about these other men, that he told Yolanda, listen, if you're afraid that I'll react badly, if you're having an affair, I want you to be honest, handcuff me." Tr. 136.

- "Birt going to testify that this period of time—well, let me back up. He will testify that he's been with this woman 20 years and that he knows her personality for the lack of a better word. . . . He knows her on her medication and he knows her when she's not on the medication. Birt's going to tell you that on this evening she was not on her medication." Tr. 136.

After the State rested, Ford recalled Yolanda briefly and then rested. Tr. 292−300. There was no exchange with the trial court about whether Ford would testify or whether he knowingly waived the right to testify. *Id.* And trial counsel did not explain during closing argument why Ford had not testified. *Id.* at 315−21.

The Indiana Court of Appeals rejected the argument as follows:

First, this argument is partially premised on the false claim, made in the last section, that the prosecutor improperly told the jury that it could hold Ford's failure to testify against him. Second, Ford does not explain how his trial counsel could have prevented him from taking the stand if he had insisted on testifying. Finally, there is no reason to believe that testifying would have helped Ford. Ford's "side of the story" was already going to be before the jury, in the form of his videotaped statement. If Ford had testified in [a] way consistent with his statement, his testimony would have been merely cumulative. If he had contradicted his statement, he would have impeached himself. Moreover, in either circumstance he would have been subject to cross-examination, which we cannot imagine would have helped him. Under the circumstances, we conclude that Ford has failed to establish that his trial counsel was ineffective in this regard.

*Ford II*, 2020 WL 1316389 at *7.

The court's reasoning addressed half of Ford's claim—that counsel should have called him to testify in his defense. But it did not address the other half—that trial counsel was ineffective

22

when he promised the jury that Ford would testify and then failed to explain why that promise was not met. In doing so, the court failed to recognize the damage trial counsel may have caused by vehemently promising that Ford would testify only to change course with no explanation. "Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir. 2003); *see also Myers v. Neal*, 975 F.3d 611, 621 (7th Cir. 2020) ("Making false promises about evidence in an opening statement is a surefire way for defense counsel to harm his credibility with the jury."). The harm is particularly significant when the broken promise is that the defendant will testify in his own defense. *Barrow v. Uchtman*, 398 F.3d 597, 606 (7th Cir. 2005) (citing *Hampton*, 347 F.3d at 257−60).

Of course, failing to follow through on statements during opening does not always amount to deficient performance. Sometimes "unforeseeable events" or "unexpected developments ... warrant ... changes in previously announced trial strategies." *Hampton*, 347 F.3d at 257. But that's not the case here. Trial counsel moved to suppress the videotaped statement before trial began, which the trial court denied, stating there was no "Fifth Amendment problem here whatsoever." Tr. 12. Thus, the subsequent admission of the videotape could not be viewed as unforeseeable or unexpected. The Indiana Court of Appeals' conclusion that trial counsel was not deficient was an unreasonable application of *Strickland*. There is no evidence suggesting that counsel made a strategic decision by promising six times during opening that Ford would testify, only to not call him and not explain why during closing argument.

But "the Supreme Court has never hinted at a *per se* rule that defense lawyers must keep all promises made in opening statement," and accordingly Ford must show he was prejudiced by

23

the change in strategy. *Fayemi v. Ruskin*, 966 F.3d 591, 594 (7th Cir. 2020). Despite failing to acknowledge the harm caused by trial counsel's undelivered promise, the Indiana Court of Appeals reasonably applied *Strickland* when it determined Ford was not prejudiced by counsel's decision not to call him to testify. *See Hartsfield v. Dorethy*, 949 F.3d 307, 317 (7th Cir. 2020) (finding petitioner failed to show omitted testimony would have affected the jury's verdict where the circumstantial evidence was strong and the proposed testimony was "little more than a generic denial of guilt."). As the state court observed, Ford presented his version of events in the videotaped statement to police, and he would have been impeached if his testimony deviated from his statement. Further, his concern about the prosecutor's statement during opening was misplaced since, as discussed above, she explained at length that the jury could not hold his decision not to testify against him. Finally, as previously discussed, the evidence against Ford was strong.

In short, although the Indiana Court of Appeals' unreasonably concluded that trial counsel was not deficient when he promised to call Ford to testify and then failed to explain why he did not, Ford has not shown he was prejudiced by this error.

**7. Failure to Raise *Batson* Challenge**

Ford next alleges that trial counsel was ineffective for failing to challenge the alleged removal of the only Black juror from the jury pool without justification. The Indiana Court of Appeals properly identified *Batson v. Kentucky*, 476 U.S. 79 (1986), as the relevant legal framework. *Ford II*, 2020 WL 1316389 at *8. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson*, 476 U.S. at 86. "Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its preemptory strikes. The trial judge must determine whether the prosecutor's stated reasons were

the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019).

In his affidavit in support of his petition, Ford stated that trial counsel "allowed the only black [juror] to be struck while I was using the restroom claiming the State had proven this person had won a lawsuit against the city." PCR App'x Vol. II at 144. The post-conviction court rejected this claim, finding that Ford offered no information about the identity of the juror, and his claim was unsupported by the trial record. Dkt. 8-10 at 20, ¶ 16. The trial record showed that Ford took a restroom break during voir dire, but no proceedings occurred in his absence. Tr. 80. The Indiana Court of Appeals agreed with the post-conviction court, finding Ford had failed to provide any evidence beyond his self-serving affidavit in support of this "somewhat implausible claim." *Ford II*, 2020 WL 1316389 at *8. This was a reasonable application of *Strickland*.

### 8.  Miscellaneous Arguments

There were two additional instances of attorney error raised in Ford's appellate brief that were not explicitly addressed by the Court of Appeals.

*Harrington v. Richter*, 562 U.S. 86, 98 (2011), holds that "[w]hen a state court rejects a prisoner's federal claim without discussion, a federal habeas court must presume that the court adjudicated it on the merits unless some state-law procedural principle indicates otherwise." *Lee v. Avila*, 871 F.3d 565, 567-68 (7th Cir. 2017). "The *Richter* presumption applies when the state court's decision expressly addresses some but not all of a prisoner's claims." *Id.* (citing *Johnson v. Williams*, 568 U.S. 289 (2013). "We've explained that under *Richter* and *Williams*, the 'state courts must be given the benefit of the doubt when their opinions do not cover every topic raised by the habeas corpus petitioner.'" *Id.* at 571 (quoting *Brady v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013)). In sum, "[w]hen applying § 2254(d) to an argument not explicitly addressed in the state

court's opinion, "a habeas court must determine what arguments or theories . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

First, Ford alleged that trial counsel failed to object to the following statement the prosecutor made in closing argument:

> He wants you to believe that Yolanda is so off her meds and acts differently and Yolanda told you she—the meds makes [sic] her feel horrible. She doesn't like the way she feels. She also told you that she's still not taking her meds, she's still in counseling, she's still seeing a doctor and her counselor knows. So does he know better than all the medical professionals who are working with Yolanda?'

Dkt. 8-11 at 20 (quoting trial transcript at 324). Ford alleges this statement was prosecutorial misconduct and an objection would have been sustained. *Id.* at 20−21. The post-conviction court found that "[a]n objection to the Deputy Prosecutor's rhetorical question in closing argument about whether Petitioner knew better than the medical professionals would have been sustained as referring to facts not in evidence." Dkt. 8-10 at 18, ¶ 12. However, Ford failed to show prejudice because he did not explain how "this apparently tangential point in relation to the victim's credibility or any other issue" would have affected the outcome of trial. *Id.* The Court can "presume that by affirming the judgment, the appellate court agreed" with this reasoning. *Lee*, 871 F.3d at 572.

Because the post-conviction court did not explicitly address the deficient performance prong (that is, the court found an objection would have been sustained but not whether it fell below prevailing professional norms not to object), this Court reviews this prong *de novo*. *Campbell v. Reardon*, 780 F.3d 752, 769 (7th Cir. 2015). Even assuming an objection would have been sustained, trial counsel did not perform deficiently by failing to object. "[I]t's not uncommon for

lawyers to refrain from objecting during closing argument and to depart from that practice only when confronted with a serious misstep by opposing counsel." *Id.* The prosecutor's closing argument was lengthy and focused on facts in evidence. Tr. 301−14, 322−27. Her offhanded comment about Ford's medical knowledge was not such a serious misstep as to compel an objection. Ford's claim fails to satisfy either *Strickland* prong.

Second, Ford alleged that counsel was ineffective when he elicited testimony from Laressa about whether she has seen her dad angry because it opened the door to harmful evidence. Dkt. 1 at 25. Trial counsel asked, "You've seen your dad mad before haven't you? … He—he gets pretty vocal when he gets upset, doesn't he?" Tr. 209−10. Laressa answered yes. *Id.* On re-direct, Laressa testified that when Ford became angry with Laressa, he said, "Fuck that bitch." *Id.* at 211. Ford raised this claim in his petition for post-conviction relief, PCR App'x Vol. II, his affidavit in support, *id.* at 144, and his appellate brief, dkt. 8-11 at 31, but it was not addressed by the post-conviction court or the Indiana Court of Appeals. Without testimony from trial counsel, it's difficult to find a strategic reason for asking Laressa this question. Maybe trial counsel wanted to highlight that Ford had a bad temper but would not physically harm his family members. *See* tr. 205 (Counsel: "Your dad has never harmed you, would he?" Laressa: "No."). But even assuming trial counsel performed deficiently for eliciting testimony that opened the door to harmful testimony, Ford has not shown prejudice in light of the corroborating evidence of his guilt.

### 9. Cumulative Prejudice

Where counsel's performance was deficient in more than one instant, the court must consider the cumulative effect of the errors to determine prejudice. *Cook v. Foster*, 948 F.3d 896, 908 (7th Cir. 2020) ("[W]e set aside any alleged error for which [counsel's] performance did not

fall below the constitutional minimum; we look only at the question whether areas in which his performance was deficient, taken as a whole, led to a reasonable probability of a different result.").

Ford alleges that the cumulative impact of trial counsel's errors prejudiced him. The Indiana Court of Appeals made short shrift of this claim, stating, "Ford, however, has failed to establish that any of his claims have merit. Because nothing plus nothing still equals nothing, Ford's claim of cumulative error fails." *Ford II*, 2020 WL 1316389 at *8.

The Court finds or assumes that counsel was deficient at trial for (1) promising the jury that Ford would testify in his defense, only to not call Ford and not address his lack of testimony and (2) eliciting testimony from Laressa about Ford's temper. But in light of the substantial evidence against Ford and the relatively minor consequences of counsel's trial errors, Ford has not shown that he suffered substantial prejudice. *See Myers*, 975 F.3d at 624.

### C. Ineffective Assistance of Appellate Counsel

Ford alleges appellate counsel was ineffective for failing to raise two arguments. "The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (noting that when the claim is poor issue selection, "appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised").

First, Ford alleges that appellate counsel was ineffective for not challenging the admission of the January and May incidents under Indiana Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Recall, appellate counsel had challenged the admission of the evidence under Rule 404(b) only. *Ford I*, 2006 WL 3196722, *2−4. On direct

28

appeal, the Indiana Court of Appeals mentioned Rule 403 but determined a separate analysis was not necessary because it concluded "that any error in the admission of the evidence did not affect Ford's substantial rights and therefore constitutes harmless error." *Id.* at *4. And because the court determined that admission of the evidence was harmless on direct appeal, the Indiana Court of Appeals held on post-conviction review that appellate counsel was not ineffective for failing to raise the issue. *Ford II*, 2020 WL 1316389 at *9. This was a reasonable application of *Strickland*. The Court essentially determined that Ford suffered no prejudice because the introduction of the evidence was harmless in light of the other evidence of Ford's guilt.

Ford's second claim was that appellate counsel was ineffective for failing to challenge the imposition of consecutive sentences. The Indiana Court of Appeals swiftly rejected this argument because appellate counsel did argue that consecutive sentences were unreasonable, and "Ford's appellate counsel could not have been ineffective for not making an argument that he did, in fact, make." *Id.* This was a reasonable application of *Strickland*.

## IV. CERTIFICATE OF APPEALABILITY

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Instead, the petitioner must first obtain a certificate of appealability, which will issue only if the petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(1), (c)(2).

Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of

appealability when it enters a final order adverse to the applicant." Ford's first claim is not cognizable. The Indiana Court of Appeals reasonably applied federal law when it analyzed each of Ford's ineffective assistance of trial counsel claims with respect to trial performance and his two appellate counsel claims. However, because jurists of reason could disagree with the Court's resolution of Ford's ineffective assistance during plea-bargaining claim and his eligibility for an evidentiary hearing on that claim, and because the issue deserves encouragement to proceed, a certificate of appealability is **granted** as to that claim.

## V. CONCLUSION

Ford's habeas petition is **DENIED**, and the action is **DISMISSED**. A certificate of appealability shall issue as to his ineffective assistance of trial counsel at the plea-bargaining stage claim.

Final judgment in accordance with this Order shall now issue.

**IT IS SO ORDERED**.

Date:     9/28/2021

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distribution:

BIRT FORD
157207
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Tyler G. Banks
INDIANA ATTORNEY GENERAL
tyler.banks@atg.in.gov